IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 94-10066

MILLGARD CORP.,

                              Plaintiff-Appellee,
                              Cross-Appellant,

                    versus

McKEE/MAYS, A JOINT VENTURE,

                              Defendant-Third-Party
                              Plaintiff-Appellant-
                              Appellee,
                              Cross-Appellee,

                    versus

DALLAS COUNTY AND THE COMMISSIONERS'
COURT OF DALLAS COUNTY,

                              Third-Party Defendants-
                              Appellants,
                              Cross-Appellees.

Appeal from the United States District Court
for the Northern District of Texas

(March 31, 1995)

Before HIGGINBOTHAM, SMITH, and STEWART, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This Texas diversity case raises the familiar question of a price adjustment to a construction contract. Here a subcontractor encountered wet soil while sinking piers for a foundation. A soil report accompanying the bid documents signaled dry soil, but the bid documents stated that this soil report was not part of the contract documents. A provision in the subcontract allowed for

price adjustment if the subcontractor encountered conditions at variance with those indicated in the subcontract or those ordinarily encountered. Another clause disclaimed all responsibility for the accuracy of the soils investigation. We hold that the subcontract provided for adjustment of contract price in two circumstances and neither was present. We reverse the judgment of the district court entered upon a jury verdict and vacate a judgment against the owner that passed the price increases through to the owner.

## I.

On April 5, 1978, Dallas County contracted with McKee/Mays for the construction of a new county jail and courthouse, called the Lew Sterrett Justice Center. In November 1978, McKee/Mays solicited bids to subcontract the pier drilling for caisson foundations for the project. McKee/Mays gave Millgard a packet of information about the project, including a set of instructions to bidders, the project specifications, and a copy of some soil boring logs. Mason-Johnston & Associates had conducted the soils investigation at Dallas County's request. Section 1.21(b)(3) of the instructions to bidder warned that the soil "[r]eport and log of borings is available for Bidders' information only. The report is not a warranty of subsurface conditions, nor is it a part of the Contract Documents." Section 1.21(c) continued:

1. Bidders are expected to examine the site and the subsurface investigation reports and then decide for themselves the character of the materials to be encountered.

2

2. The Owner, Architect and Construction Manager disclaim any responsibility for the accuracy, true location and extent of the soils investigation that has been prepared by others. They further disclaim responsibility for interpretation of that data by Bidders, as in projecting soil-bearing values, rock profiles, soil stability and the presence, level and extent of underground water.

On January 10 and 11, 1979, Millgard's officials met in Dallas with McKee/Mays's officials and discussed the project, including subsurface conditions. McKee/Mays's officials gave them a copy of the soil report written by Mason-Johnston. Millgard's officials visually inspected the site, examined soil samples, and spoke with Bill Howard, one of the authors of the soil report. Millgard interpreted the data to indicate no problem water in the soil, and Howard concurred. At the scheduled pre-bid conference on January 11, Howard told bidders that the driller would encounter dry, cohesive soil that was probably clay, except in the fill and shale layers. He stated that there was no reason to anticipate problem water, and told bidders to look at the soil report and samples. Though one other bidder drilled its own test hole, Millgard did not do so.

On January 18, 1979, Millgard submitted a winning bid of $2,987,000. Millgard then submitted proposed drilling plans to McKee/Mays for approval. Millgard proposed to insert temporary casings through the fill layer. These casings would clear the way for drilling through the dry clay until the drill reached the sand and gravel layer above the shale, at which point Millgard would insert another casing. The plan reiterated Howard's statement that

3

"problem volumes of water would not be expected." McKee/Mays, Dallas County, and Mason-Johnston reviewed and approved the plans.

McKee/Mays signed the subcontract with Millgard on March 6, 1979. Section 12.2.1 of the subcontract contained a clause entitled "CONCEALED CONDITIONS":

> Should concealed conditions encountered in the performance of the Work below the surface . . . be at variance with the conditions indicated by the Contract Documents, or should unknown physical conditions below the surface of the ground . . . differing materially from those ordinarily encountered . . . be encountered, the Contract Sum shall be equitably adjusted by Change Order . . . .

Millgard began work in late June 1979. It encountered a layer of quicksand-like material, between five and fifteen feet thick, between the fill area and the sand and gravel layer. These conditions affected seventy-four percent of the holes drilled and made the drilling plans impractical. Millgard spent more money than it expected, completing the work in early January 1980. Millgard sought its additional costs, and McKee/Mays forwarded its claim to Dallas County. Dallas County decided that the conditions were not materially different from those indicated by the contract documents and refused to adjust the contract price.

Millgard brought this diversity suit in federal district court to recover its additional costs. McKee/Mays filed a third-party claim for indemnity from Dallas County. A jury trial followed. The district court redacted section 1.21(b)(3) of the instructions to bidders in the version of the contract that was introduced into evidence. The deleted language read: "nor is [the soil report] a part of the Contract Documents." The court also excised

4

section 1.21(c)(2), which stated that the owner, architect, and McKee/Mays "disclaim any responsibility for the accuracy . . . of the soils investigation [and] interpretation of that data." The court forbade McKee/Mays and Dallas County to mention this language or to elicit it at trial. The jury was asked whether Millgard "reasonably relied on the subsurface information furnished to it in its preparation of its bid" and whether conditions "differed materially from those conditions indicated by the subsurface information." The jury answered "yes" to both questions. The court denied defendants' motions to set aside the verdict and for judgment as a matter of law, entered judgment for Millgard, and ordered Dallas County to indemnify McKee/Mays for the full amount of the judgment. McKee/Mays and Dallas County appeal, and Millgard cross-appeals the rate of prejudgment interest.

## II.

The district court reasoned that all of the parties "relied on the accuracy of the soil report" and that the disclaimers did not "preclude, for all purposes, reliance on the soil report." Instead, the court interpreted the disclaimers as insuring "that any inaccuracies in the soil report would be inadequate grounds to rescind, or excuse nonperformance of, [Millgard's] contractual obligation to construct the caissons." The district court therefore redacted the disclaimers and phrased the jury instructions to allow Millgard to recover an equitable adjustment based on its reliance on the soil reports.

5

Millgard does not rely upon the second half of the concealed conditions clause, dealing with conditions not "ordinarily encountered." Its sole theory of liability is a breach of contract claim resting on the first half of the clause, which permits a price adjustment if conditions are "at variance with the conditions indicated by the Contract Documents."

One problem with this contention is that section 1.21(c)(2) "disclaim[s] any responsibility for the accuracy, true location and extent of the soils investigation," including data concerning "the presence, level and extent of underground water." Section 1.21(b)(3) is even more explicit: "The [soil] report is not a warranty of subsurface conditions, nor is it a part of the Contract Documents." If the soil report is not part of the contract documents, it cannot form the basis of a claim that conditions were "at variance with the conditions indicated by the Contract Documents." The district court's gossamer distinction between grounds for escaping the contract and grounds for claiming an equitable adjustment finds no anchor in the blunt contract language disavowing "any responsibility." Part 1.05 of the project manual's earthwork specifications underscores this point: "No allowance or extra payments will be made by reason of variation in types of soil encountered or variations in their moisture contents."

Nor do we find persuasive case law holding that "conditions indicated by the Contract Documents" can embrace soil reports that are not themselves part of the contract documents. <u>City of Columbia v. Paul N. Howard Co.</u>, 707 F.2d 338, 340 (8th Cir.), <u>cert.</u>

6

denied, 464 U.S. 893 (1983); Fattore Co. v. Metropolitan Sewerage Comm'n, 454 F.2d 537, 542 (7th Cir. 1971), cert. denied, 406 U.S. 921 (1972).  Either the soil report is part of the contract documents or it is not.  Whatever be the force of trade customs in the absence of controlling contract language, the plain language of section 1.21 "disclaim[s] any responsibility" and excludes the soil report from the contract documents.

Millgard and the district court argue that giving effect to the literal wording of the disclaimers would gut the concealed conditions clause.  See Foster Constr. C.A. & Williams Bros. Co. v. United States, 435 F.2d 873, 888 (Ct. Cl. 1970) (collecting cases). But the converse holds true--allowing reliance on the soil reports under the concealed conditions clause would eviscerate the disclaimers.  Nor is it true that the concealed conditions clause would lack meaning if the disclaimers are given effect.  The concealed conditions clause would still allow for equitable adjustment based on subterranean conditions that are not "ordinarily encountered."  It would also allow for equitable adjustment based on variances from any contract documents, such as the blueprints and specifications.  These contract provisions do not clash.  Even if they did clash, we would enforce the disclaimers because they specifically mention the soils investigation while the concealed conditions clause does not.  It is a maxim of interpretation that when two provisions of a contract conflict, the specific trumps the general.  United States Postal

7

<u>Serv. v. American Postal Workers Union</u>, 922 F.2d 256, 260 (5th Cir.), <u>cert. denied</u>, 112 S. Ct. 297 (1991).

In short, the disclaimers and the language of the project manual show that the parties placed the risk of underground water on Millgard. Millgard took its chances by not boring its own hole and instead relying on the soil reports. The bargain struck by the parties allocated the risk and there it ends. We enforce the contract.

## III.

Because the disclaimers were effective as a matter of law to disavow all responsibility for the soils investigation, the district court erred in redacting the contract, limiting argument and testimony, and phrasing the jury instructions. The district court should instead have granted the motions for judgment as a matter of law. The district court was correct, however, in rejecting McKee/Mays's claim against Dallas County for reimbursement of its attorney's fees. Texas law grants Dallas County governmental immunity from such awards. <u>See</u> Tex. Loc. Gov't Code Ann. § 5.904 (Vernon Supp. 1995); <u>City of Terrell v. McFarland</u>, 766 S.W.2d 809, 813 (Tex. App.--Dallas 1988, writ denied). We need not reach the other issues presented on appeal or cross-appeal. We REVERSE the judgment of the district court on Millgard's claims and RENDER judgment for McKee/Mays. We AFFIRM the portion of the district court's judgment that rejects McKee/Mays's claim against Dallas County for its attorney's fees

and VACATE the judgment against Dallas County and in favor of McKee/Mays, there now being no award against McKee/Mays.

AFFIRMED IN PART, VACATED IN PART, AND REVERSED IN PART.