# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00436-CV

**Granite Construction Company and J. D. Abrams, L.P., Appellant**

**v.**

**Texas Department of Transportation, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. D-1-GN-10-002178, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal arises from a dispute over a highway construction contract between the Texas Department of Transportation and a joint venture, Granite Construction Company and J. D. Abrams, L.P. ("Granite"). *See* Tex. Transp. Code Ann. § 201.112 (West 2011). Granite initiated the claim and this appeal on behalf of its subcontractor, ATS Drilling, L.P.[1] After ATS initiated administrative proceedings asserting that it was entitled to additional compensation for its work on the highway construction project, the Department denied its claim. ATS filed suit in district court seeking judicial review of the Department's final order. The district court affirmed the order, which ATS challenges on appeal in three issues. ATS contends that: (1) substantial evidence does not support the Department's decision that the construction site conditions were not significantly different than represented in the contract, (2) substantial evidence does not support the Department's decision that casing was required to prevent caving or water intrusions in certain drill

---

[1] The parties agree that ATS is the real claimant in interest. Consequently, we will refer to ATS as the claimant, not Granite, when discussing the contract-claim proceeding.

shafts, and (3) ATS should have recovered damages, interest, and attorneys' fees. We will affirm the district court's judgment because we find no error in the Department's final order.

**BACKGROUND**

ATS's contract claim against the Department stems from foundation drilling work that ATS performed on a toll-road construction project for State Highway 45 in Williamson County.[2] The area where the highway was constructed is located within the Edwards Aquifer Recharge Zone. The Edwards Aquifer is a geological formation known to have highly varied subsurface conditions and extensive groundwater. The contract documents for the project noted the existence of active springs in the area of the construction project.

Before opening up the project for bids, the Department retained an engineering consulting firm, Raba-Kistner-Brytest Consultants, Inc., to prepare a geotechnical study of the project area. The Raba-Kistner report included boring logs and data reflecting Raba-Kistner's characterization of the subsurface materials found in boring samples drilled in the project area. The Department provided excerpts from the Raba-Kistner report, including the boring-sample analysis, as part of the documents given to potential bidders for the project, but it did not include all of the notes and comments contained in the "Additional Remarks" sections of the boring-sample analysis or other introductory comments to the report.

Granite entered into a contract with the Department in 2003 for the highway construction project. Granite subsequently entered into a subcontract with ATS under which ATS agreed to complete drill shafts and install concrete foundations for abutments and bridges for a

---

[2] The facts recited herein are taken from the testimony and exhibits admitted at the contested-case hearing.

2

portion of State Highway 45. ATS and its predecessor companies have been in business for over 60 years, and ATS is one of the largest foundation drilling contractors in the state. ATS began work on the project in January 2004.

The work that ATS had agreed to do is generally a relatively straightforward process that involves using a large drilling rig to bore a shaft into the ground until a predetermined depth of solid rock is reached. The next step is the construction of a cage of reinforcing steel bar that is lowered into the shaft. After that, concrete is poured into the shaft to fill the hole, which provides structural foundation support for abutments and bridges.

After it had begun work, ATS encountered problems during the drilling, including groundwater, unstable surface conditions leading to concerns that the shafts would cave in (known as "caving"), and varying subsurface conditions that made drilling inconsistent and difficult. In particular, on or about February 23, 2004, ATS began seeing caving issues in the drill shafts. It notified Granite, which notified the Department, that ATS had encountered underground soil conditions that differed from those shown in the soil borings that were part of the bid documents. When drilling roadway support shafts, caving is a concern because an unstable hole can lead to foreign material (dirt or rock) becoming mixed in with the concrete. Foreign material in the concrete can result in a void in the drill shaft, which makes the shaft unstable, which in turn affects the stability of the bridge.

The parties disagreed about what method ATS should use for handling the caving issues that it began encountering in shafts. ATS wanted to use the underwater-pour method. The underwater-pour method involves drilling the shaft and then placing a specific type of concrete into the bottom of the shaft through a sealed tremie (which is a 10- to 12-inch steel pipe used to

3

pour concrete into the bottom of the hole). A foam plug is placed in the tremie and then concrete is poured through the top of the tremie, which pushes the foam plug through the tremie. The plug and the concrete displace the water and other caving materials in the drill shaft—the water and caving materials rise higher while the concrete fills the shaft from the bottom up. The end of the tremie remains below the top of the poured concrete, which keeps the new concrete coming in through the tremie free from contamination by water and caving materials above the surface of the poured concrete.

On February 24, 2004, the Department informed ATS that Item 416.3(1)(a) of the specifications that were part of the bid documents established the required construction methods where there were caving and groundwater concerns:

> Where caving conditions and/or excessive ground water is encountered, no further drilling will be allowed until a construction method is employed which will prevent excessive caving that will cause the excavation to be appreciably larger than the size of the casing to be used.

> Casing will be required when necessary to prevent caving of the material or when necessary to exclude groundwater. Casing will be of sufficient strength to withstand handling stresses, the pressure of concrete and of the surrounding earth or backfill materials, and shall be watertight, smooth, clean and free of accumulations of hardened concrete.

The Department's director of turnpike construction, Timothy Weight, directed ATS to present a plan that provided for the immediate installation of casing when ATS encountered groundwater in a shaft and a plan that provided for the casing to be advanced into the shaft as needed to stop the caving. Weight testified that the biggest reason for requiring casing was the caving issue. While ATS was allowed to use the underwater-pour method on a case-by-case basis for holes that did not have stability issues, for holes with water infill and caving issues, the Department required ATS to drill

4

using either a slurry method or a casing method. Both methods are significantly more expensive and time-consuming than the underwater-pour method. ATS chose to use the casing method.[3]

The casing method involves using a circular, tube-like steel casing that is installed in the shaft around the drilling equipment. The casing maintains the shaft's integrity while it is being drilled until the concrete can be poured. The Department's specifications required each hole to reach at least one shaft diameter into a layer of solid limestone. For example, if the shaft diameter is 36 inches across, then before concrete can be poured, the shaft needs to reach 36 inches deep into solid limestone, however far down that layer of limestone is. When ATS drilled down into a hole using casing inside the drill shaft, if the casing it was using was not long enough to reach solid limestone of the required thickness, ATS would backfill the hole with "process mud," a mix of the water and caving materials in the hole, to keep the upper layer from caving, and then pull the casing out. After pulling the casing out, ATS would weld an additional length of casing onto the original piece, and using the longer piece of casing, it would resume drilling for solid limestone. Brent Lawler, ATS's project manager for this construction project, testified that on some shafts multiple water-bearing layers were hit, which then required this process to be repeated more than once.

Weight testified that when caving issues occur at the top of a hole, the more common practice is to put in an oversized casing, which is called a surface casing. A driller will use that casing to secure the top part of the hole to keep it stable while drilling the hole all the way down until the drill hits solid limestone that is the required thickness for that drill shaft. Once the driller knows

---

[3] The slurry method involves making a mixture of bentonite clay (which is heavier than water) and water that will stabilize sand or some gravel formations and prevent caving. The Department requires that all of the slurry be recaptured even when a project is not in a recharge zone, but in a recharge zone, the Department is especially particular about not allowing any of the slurry to contaminate the aquifer. Weight estimated that 98% of drill shafts in Texas requiring stabilization are built with steel casing and only 2% using slurry.

how deep that shaft is going to be, then the surface casing will be pulled out and replaced with the more narrow casing that is the right length for the shaft. Weight testified that even with this method it happens that additional casing sometimes needs to be added, but that it would be unusual for it to have to be done as many times as ATS did it.

ATS initially estimated that it would complete its work on the project in 81 "rig days."[4] Instead, it took ATS 238 "rig days" to finish its work. When ATS notified the department on February 23, 2004 that it had encountered subsurface conditions different from those shown in the soil borings, it also informed the Department that "these unforeseen conditions were not anticipated in our original agreement" and might cause ATS to incur additional costs. ATS also advised the Department that ATS believed that it had the right to use the underwater-pour method under the Department's specifications. As noted above, the Department disagreed and required ATS to use casing or slurry on holes with caving issues and allowed the use of the underwater-pour method only on a case-by-case basis. When the project was finished, ATS sought additional compensation based on its claims that the Department (1) had not provided it with complete and accurate information about the underground soil conditions and (2) unreasonably required it to modify its means and method of construction.

ATS filed a formal claim with the Department's contract claim committee on February 18, 2008. *See* Tex. Transp. Code Ann. § 201.112(a) (authorizing Texas Transportation Commission to establish procedures for informal resolution of contract claims). After the committee denied the claim, ATS filed a petition for a contested-case hearing, and the Department referred the matter to the State Office of Administrative Hearings for assignment of an administrative law judge

---

[4] A "rig day" is a day that a rig is drilling. In other words, if two rigs are drilling on the same day, that counts as two "rig days."

6

(ALJ) to conduct a hearing and issue a proposal for decision (PFD). *See id.* § 201.112(b), (c) (allowing claimant dissatisfied with results of informal claim-resolution procedure to request formal administrative hearing and establishing that ALJ's PFD will be submitted to Department's executive director for adoption); 43 Tex. Admin. Code § 9.2(g)(4) (2012) (Tex. Dep't of Transp., Contract Claim Procedure).[5] The ALJ conducted a two-day hearing on the merits. After the record closed, the ALJ issued a PFD that included 35 findings of fact and 6 conclusions of law. The Department's executive director adopted the ALJ's findings of fact and conclusions of law in the Department's order denying ATS's claim for additional compensation.

ATS sought judicial review of the Department's order in district court. After a hearing on the merits, the district court affirmed the Department's order, which it found was supported by substantial evidence. This appeal followed.

## DISCUSSION

On appeal, ATS challenges the Department's decisions that (1) the construction site conditions were not significantly different than represented in the contract, (2) casing was required to prevent caving or water intrusions in certain drill shafts, and therefore, (3) ATS was not entitled to recover damages, interest, and attorneys' fees.

**Standard of review**

The substantial-evidence standard of the Texas Administrative Procedure Act (APA) governs our review of the Department's final order. *See* Tex. Gov't Code Ann. § 2001.174

---

[5] We cite to the current versions of the statutes and administrative code for convenience because there have been no intervening amendments that are material to our disposition of this appeal.

(West 2008). The APA authorizes reversal or remand of an agency's decision that prejudices the appellant's substantial rights because the administrative findings, inferences, conclusions, or decisions (1) violate a constitutional or statutory provision, (2) exceed the agency's statutory authority, (3) were made through unlawful procedure, (4) are affected by other error of law, or (5) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *Id.* § 2001.174(2)(A)-(D), (F). Otherwise, we may affirm the administrative decision if we are satisfied that "substantial evidence" exists to support it. *Id.* § 2001.174(1), (2)(E).

Instances may arise, however, in which the agency's action is supported by substantial evidence, but is nonetheless arbitrary and capricious. *See Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 454 (Tex. 1984). An agency acts arbitrarily if it makes a decision without regard for the facts, if it relies on fact findings that are not supported by any evidence, or if there does not appear to be a rational connection between the facts and the decision. *See City of Waco v. Texas Comm'n on Envtl. Quality*, 346 S.W.3d 781, 819-20 (Tex. App.—Austin 2011, pet. denied). In other words, we must remand for arbitrariness if we conclude that the agency has not "'genuinely engaged in reasoned decision-making.'" *Id.* (quoting *Starr Cnty. v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 356 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.)).

We review the agency's legal conclusions for errors of law and its factual findings for support by substantial evidence. *Heat Energy Advanced Tech., Inc. v. West Dallas Coal. for Envtl. Justice*, 962 S.W.2d 288, 294-95 (Tex. App.—Austin 1998, pet. denied). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact." *Lauderdale v. Texas Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ) (quoting *Pierce*

*v. Underwood*, 487 U.S. 552, 564-65 (1988)) (internal quotation marks omitted). We consider the reliable and probative evidence in the record as a whole when testing an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence. *Graff Chevrolet Co. v. Texas Motor Vehicle Bd.*, 60 S.W.3d 154, 159 (Tex. App.—Austin 2001, pet. denied); *see* Tex. Gov't Code Ann. § 2001.174(2)(E). We presume that the Department's order is supported by substantial evidence, and ATS bears the burden of proving otherwise. *See Charter Med.*, 665 S.W.2d at 453. The burden is a heavy one—even a showing that the evidence preponderates against the agency's decision will not be enough to overcome it, if there is some reasonable basis in the record for the action taken by the agency. *Id.* at 452. Our ultimate concern is the reasonableness of the agency's order, not its correctness. *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984).

Whether the agency's order satisfies the substantial-evidence standard is a question of law. *Id.* Thus, the district court's judgment that there was substantial evidence supporting the Department's final order is not entitled to deference on appeal. *See Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam). On appeal from the district court's judgment, the focus of the appellate court's review, as in the district court, is on the agency's decision. *See Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000); *Tave v. Alanis*, 109 S.W.3d 890, 893 (Tex. App.—Dallas 2003, no pet.).

**Applicable law and contract provisions**

When a contract designates the Department's engineer as the final authority and referee in resolving all questions arising under the contract terms, then that designated engineer's decision is final, conclusive, and binding on the parties. *See Texas Dep't of Transp. v. Jones Bros.*

9

*Dirt & Paving Contractors, Inc.*, 92 S.W.3d 477, 481 (Tex. 2002). The decision will not be deemed to violate the contract unless the decision is based on partiality, fraud, misconduct, or gross error. *Id.* This standard has also been memorialized in the Department's rules. *See* 43 Tex. Admin. Code § 1.31(b) (2012) (Tex. Dep't of Transp., Provisions for Contract Claims).

In this case, the parties agreed that a Department engineer would referee any contract disputes. As part of the bid documents, the Department included a provision that incorporated sections one through nine of the "Standard Specifications for Construction and Maintenance of Highways, Streets, and Bridges" (the "Specifications") adopted by the Department on March 1, 1993.[6] Item 5.2 of the Specifications provides that "[t]he Engineer will act as referee in all questions arising under the terms of the contract between the parties thereto and his decisions shall be final and binding." Item 5.1 establishes the authority of the engineer:

> The work will be observed, tested and inspected by the Engineer in accordance with the contract, plans and specifications. The Engineer will decide all questions which may arise as to the quality or acceptability of materials furnished and work performed; the manner of performance and rate of progress of the work; the interpretations of the plans and specifications and the acceptable fulfillment of the contract on the part of the Contractor. His decisions will be final and he will have executive authority to enforce and make effective such decisions and orders as the Contractor fails to carry out promptly.

Both of the issues raised by ATS involve decisions made by the Department's engineer in the exercise of his authority as established by these contract provisions. At the hearing, Weight, the Department's director of turnpike construction and its engineer on the project, testified

---

[6] Although only certain provisions in the Specifications were introduced into evidence at the contested-case hearing, ATS used the 1993 version of the "blue book" of the Department's Specifications as a demonstrative exhibit. Lawler, ATS's project manager, agreed that the Specifications were incorporated into the contract with the Department and that ATS was obligated to use them.

that he was the one with the authority to decide whether the site conditions portrayed in the plans were relatively the same as the actual site conditions and to decide whether casing was required by the site conditions. He determined that (1) construction site conditions were not materially different than represented in the contract or unusual in nature and (2) ATS must use casing (or slurry) when it encountered caving and water intrusion in certain drill shafts. Under the *Jones Bros.* standard, ATS had the burden of showing by a preponderance of the evidence that the Department's engineer's decisions were based upon partiality, fraud, misconduct, or gross error. We will apply the *Jones Bros.* standard when considering whether substantial evidence supports the Department's ultimate decision that ATS is not entitled to additional compensation.

**Construction-site conditions**

In its first issue, ATS contends that it is entitled to additional compensation of $329,873 because it encountered circumstances not foreseen at the time it submitted its bid. ATS asserts that the varying geological conditions it encountered at the project site were different from the conditions indicated in the contract. Moreover, ATS asserts that if the Department had included more detailed information from the Raba-Kistner report in the bid documents, ATS would have understood the greater amount of work involved and submitted a much higher bid for the project.

Under the contract, Item 9.7 of the Specifications provides a protocol for handling complaints about site conditions:

> [I]f subsurface or latent physical conditions are encountered at the site, differing materially from those indicated in the contract, or if unknown physical conditions of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in the work provided for in the contract, are encountered at the site, the Party discovering such conditions shall promptly notify the other Party . . . .

11

> If [the Department engineer] determines that the conditions materially differ and cause an increase or decrease in the cost or time required for the performance of any work under the contract, an adjustment, excluding loss of anticipated profits, will be made and the contract modified in writing . . . .[7]

Thus, the Department engineer may modify the contract because of differing site conditions only if the actual site conditions differ materially from either (1) the conditions indicated in the contract or (2) the conditions ordinarily encountered and generally recognized as inherent in the work provided for in the contract. The order contains several relevant findings of fact about the site conditions, including the following:

> 25. The area of the Project is in the recharge zone of an aquifer and is known to have active springs. Therefore, the presence of underground water should have been expected by ATS.
>
> 26. The varying subsurface conditions were known or should have been known by ATS.
>
> 27. Actual site conditions did not differ materially from those indicated in the contract.
>
> 28. ATS did not encounter unknown physical conditions of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in the work provided for in the contract, at the site.

We will examine whether substantial evidence supports these findings and the Department's conclusion of law that ATS did not meet its burden of establishing that the Department's engineer's decision about the site conditions was based on fraud, partiality, misconduct, or gross error.

---

[7] The ALJ included these provisions in the PFD as two findings of fact. ATS does not challenge these two findings.

### *Evidence that actual site conditions were expected*

We first examine whether substantial evidence supports the finding that the actual site conditions were conditions ordinarily encountered and generally recognized as inherent in the work provided for in the contract. ATS's president, Fred Shin, testified that the geological features of the area west of I-35 in Austin are "unpredictable" and that there are voids, underground water, springs, recharge zones, and karst areas in addition to a wide variety of soil types.[8] He agreed that around the Austin area,

> the subsurface conditions vary a great deal. Conditions may vary from one spectrum to another including such disparate conditions as sand, gravel, clay, shale, limestone, dolomite or granite. Within the limestone itself, there are several different variations such as chalk, marl, weathered, thin layers, and thick layers, fractured, solid, fine grained, medium grained, nodular, and nodular chert.

Lawler, ATS's project manager, testified that he "expected there to be water on this project," and he was not surprised to find water. In addition, the Raba-Kistner report reflects the variability of the site conditions. Thus, substantial evidence supports the ALJ's finding that the actual site conditions were what a knowledgeable contractor should have expected at the site, and in fact, were expected by both parties.

---

[8] Dr. William Isenhower, ATS's engineering expert, explained that:

Karst geology is geology where you've had rock that's formed in place that over a period of years you've had a lot of dissolving of limestones, so you end up having, in essence, columns of limestones with intermittent crevices filled up with clay. So you could drill in one location, drill a short distance and hit rock. You move over just a few feet[,] you may drill 30 feet before you hit rock. It's highly variable.

*Evidence that conditions did not differ from contract representations*

Next, we examine whether substantial evidence supports the finding that the actual site conditions did not differ materially from the conditions indicated in the contract. The finding rests primarily on the contractual language that made the contractor responsible for investigating and determining the site conditions before bidding. As noted earlier, the Department included a provision incorporating sections one through nine of the Specifications into the bid documents and the final contract.

Item 2.3 of the Specifications establishes the following:

> [T]he bidder shall examine carefully the proposal, plans, specifications, special provisions and the form of contract to be entered into for the work contemplated. *The bidder shall examine the site of work and satisfy himself as to the conditions which will be encountered relating to the character, quality and quantity of work to be performed and materials to be furnished.* The submission of a bid by the bidder shall be *conclusive evidence* that he has complied with these requirements.
>
> Any borings, soil profiles and water elevations shown on the plans were obtained for use of the Department in the preparation of plans and the bidder is hereby cautioned regarding the accuracy of these data. The bidder, in preparing his proposal, shall take cognizance of the difficulty of accurately classifying all material encountered in making foundation investigations, the possible erosion of stream channels and banks after survey data have been obtained and the unreliability of water elevations other than for the date recorded.

(Emphasis added.) This language obliges the contractor to make his own examination of the work site and also cautions him that the Department's data is not to be relied on for accurate classification of all material encountered in foundation investigations because of the difficulty of determining subsurface conditions.

Courts interpreting similar contractual provisions have consistently held that this type of language precludes a contractor from maintaining a claim for varying site conditions. *See*

14

*Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 716-20 (5th Cir. 2005) (summarizing Texas law on issue of whether owner or contractor bears risk of inaccurate or defective plans and specifications and applying it in diversity case).[9] The Texas Supreme Court has held that submitting plans and specifications for bids does not bind the owner as a guarantor of the specifications in the absence of express or implied contractual language that would indicate that the parties intended that the owner would be liable. *Lonergan v. San Antonio Loan & Trust Co.*, 104 S.W. 1061, 1065-66 (Tex. 1907) (holding contractor not excused from contractual obligation to build house even though plans provided by owner were defective). The supreme court has also held that a contractor could not recover additional costs when the subsoil conditions differed from his expectations, which were based on plans and specifications provided by the city. *City of Dallas v. Shortall*, 114 S.W.2d 536, 540 (1938). In *Shortall*, the court held that the contractor would be able to recover damages for his additional expenses only if the owner had so affirmatively stated the subsoil conditions that the contractor was justified in relying on the statement without further investigation. *Id.* at 542. The court found that it was conclusively shown that the owner did not make any positive assertions about the soil condition at the tunnel's depth and the contractor was not justified in relying on the city's representation of a "rock line" a few feet below the surface as an assurance that there was a solid rock structure downward to the place 60 to 80 feet below the rock line where the tunnel would be driven. *Id.* at 542-43. In this case, ATS has not identified any language in the contract that shifts the burden of risk onto the Department or that constitutes affirmative representations on which ATS justifiably relied.

---

[9] When discussing these cases, we will refer to the party contracting to have the work done (e.g., the Department) as the "owner" and the party agreeing to perform the work (e.g., ATS) as the "contractor."

ATS argues that the Department lacked a legitimate reason for providing only some of the information in the Raba-Kistner report and for omitting the notes and comments from the "Additional Remarks" sections of the boring logs. ATS also asserts that the variability between the Raba-Kistner boring-log data and the conditions that ATS actually encountered (as demonstrated by its drilling logs) was material. ATS concludes that it incurred additional costs because of the erroneous information provided by the Department, and thus, the Department should be responsible for those costs, citing *IT Corp. v. MOTCO Site Trust Fund*, 903 F. Supp. 1106 (S.D. Tex. 1994). The contract in *IT Corp.* differed significantly from the contract here, however. Unlike this contract, the contract in *IT Corp.* expressly stated that the site information provided to the contractor was "reliable" and sufficient for bid preparation. *Id.* at 1117, 1121. In addition, the contract contained no language disclaiming the accuracy of the information provided. *Id.* at 1121. Moreover, the parties had agreed to remove certain language from the contract that placed responsibility for varying site conditions on the contractor, *id.* at 1117-18, which showed that they "objectively intended the owner to bear the risk that the information provided is inadequate or inaccurate." *Id.* at 1120; *see also id.* at 1125-27 & n.1.

Here, the contract contains unambiguous language placing the responsibility on the contractor for determining site conditions before bidding and disclaiming the owner's responsibility for the accuracy of the data. The legal effect of this language is that the Department had no obligation to provide the additional information in the Raba-Kistner report or the entire report to ATS, regardless of the information's potential significance. Also, ATS's comparison of its drilling logs to the Raba-Kistner borings does not demonstrate that the borings were inaccurate. The borings indicated substantial variability between boring samples, even when those samples were

located close together. The boring samples also notified bidders that there were "closely spaced fractures," "vugs," and "voids" in many of the samples.[10] The drill shafts were not placed in the exact location of any of the Raba-Kistner borings. Thus, because of the variability of the subsurface conditions at the project site, differences between the boring data and the drill shafts do not indicate that the borings were inaccurate or that the variability between the two was significantly different than had been represented by the boring data.

More recent cases involving contractual provisions similar to the provisions at issue here have applied the reasoning of *Lonergan* and *Shortall* and determined that when contractual language placed the risk of subsurface conditions on the contractor, the contractor could not recover for additional costs. *See Interstate Contracting Corp.*, 407 F.3d at 720-23; *Millgard Corp. v. McKee/Mays*, 49 F.3d 1070, 1072-73 (5th Cir. 1995) (applying Texas law in diversity case). In both those cases, as in this one, the contracts contained provisions requiring the contractor to examine the site and subsurface reports and to decide for itself about the character of the conditions it would encounter, as well as provisions disclaiming any responsibility for the accuracy of the information about subsurface conditions. *See Interstate Contracting Corp.*, 407 F.3d at 721-23 (determining that contract unambiguously placed risk of defective plans and specifications on contractor); *Millgard Corp. v. McKee/Mays*, 49 F.3d 1070, 1071-73 (5th Cir. 1995) (determining that contract placed risk of underground water on contractor). Given the contractual provisions

_____

[10] Ronny Cole, an ATS drilling rig operator and foreman, described a "void" as a place where his drill shaft starts sloughing off material and a "vug" as a small hole in shale. Dr. William Isenhower, ATS's engineering expert, stated that it was important to know about voids and vugs when drilling. He explained that if a driller hits a void when using slurry, then a piece of temporary casing must be used to seal off the drill shaft to be able to use slurry at deeper depths. He further explained that "vuggy" means different things to different people, but among other things, "generally means it might be a limestone that has undergone significant dissolution, and then the remaining voids may or may not have been filled in."

here, which place the risk of subsurface conditions on the contractor and disclaim the owner's responsibility for the accuracy of the information provided, we conclude that there is substantial evidence supporting the finding that the site conditions did not differ significantly from what was represented in the contract. Having also concluded that substantial evidence supports the finding that the conditions were not unusual in nature, we overrule ATS's first issue challenging the findings and conclusions related to differing site conditions. ATS did not meet its burden of establishing that the Department's engineer's decision about the site conditions was based on fraud, partiality, misconduct, or gross error.

**Need for casing**

In its second issue, ATS asserts that it is entitled to additional compensation of $505,452.39 for additional work required because the Department unreasonably required it to use casing or slurry on certain drill shafts. ATS argues that the underwater-pour method is allowed by the Department's Specifications, had been successfully used by ATS on many other projects (including Department projects), and had already been allowed by the Department on ten other drill shafts on the project before the Department decided it could only be used on a case-by-case basis. ATS contends that the Department does not have the "unrestrained freedom to direct the means and methods of all aspects of a contractor's work," citing this Court's decision in *Jordan Paving Corp. v. Texas Dep't of Transportation*, No. 03-04-00782-CV, 2009 WL 1607916 (Tex. App.—Austin June 3, 2009, no pet.) (mem. op.).

As previously discussed, Item 416.3(1)(a) of the Specifications expressly states that "[w]here caving conditions and/or excessive ground water is encountered, no further drilling will be allowed until a construction method is employed which will prevent excessive caving . . . "

and that "[c]asing will be required when necessary to prevent caving of the material or when necessary to exclude groundwater." Weight, the Department's director of turnpike construction and the engineer who decided that the underwater-pour method could not be used, testified to his belief that when caving concerns exist, the Specifications only allow for underwater pours to be done in conjunction with casing methods that maintain the integrity of the drill shaft or with the use of slurry. He allowed ATS to use the underwater-pour method on shafts that did not have caving issues. In addition, ATS's engineering expert, Dr. William Isenhower, testified that water alone is not an effective way to stabilize a bore hole and that there are basically two ways to stabilize a shaft—temporary casing or drilling slurry.

ATS has not established that the Department's decision to require the use of casing in shafts with caving concerns was based on fraud, partiality, misconduct, or gross error. The decision was consistent with the unambiguous terms of the contract and with ATS's own expert's testimony about the preferred ways to stabilize a drill shaft with integrity issues. *Cf. Jordan Paving Corp.*, 2009 WL 1607916, at *4-7 (reversing judgment affirming Department's order because order rejected without explanation ALJ's findings and conclusions that engineer had departed from terms of contract and denied contractor rights provided to it under contract). We conclude that substantial evidence supports the findings and conclusions related to the Department's decision that casing was required to prevent caving or to exclude groundwater in certain drill shafts. We overrule ATS's second issue.

**Damages, interest, and attorneys' fees**

In its third issue, ATS contends that it is entitled to actual damages in the amount of $835,325.39 to reimburse it for its extra expenses because the Department did not provide it with

19

complete and accurate information about the project and because of the Department's unreasonable modification of ATS's method of work. ATS also asserts that it is entitled to recover interest from July 2005, which was the month after the date it received its final payment on the project, and to recover its reasonable attorneys' fees of $38,750. We have overruled both of ATS's issues related to its actual damages and determined that the order correctly awarded it no additional compensation. Thus, we do not reach the question of whether it would have been entitled to recover interest and attorneys' fees. We overrule ATS's third issue.

## CONCLUSION

Having overruled all of Granite's issues on appeal, we affirm the district court's judgment.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed: November 20, 2012

20