**NORTH HARRIS COUNTY JUNIOR COLLEGE DISTRICT, Appellant,**

v.

**FLEETWOOD CONSTRUCTION COMPANY, Appellee.**

**No. B2177.**

Court of Civil Appeals of Texas, (14th Dist.).

June 25, 1980.

Rehearing Denied Aug. 13, 1980.

**250**

James R. Leahy, Reynolds, Allen & Cook, Houston, for appellant.

Paul W. Nimmons, Jr., Ralph Carrigan; Baker & Botts, Eliot P. Tucker; Mandell & Wright, David G. Allums; Barnes & Allums, Rayburn M. Hamilton, Donald W. Callahan; Bullock & Callahan, Eugene Pitman; DeLange, Hudspeth, Pitman & Katz, Houston, for appellee.

Before J. CURTISS BROWN, C. J., and SALAZAR and JUNELL, JJ.

SALAZAR, Justice.

This is an appeal from a judgment against North Harris County Junior College awarding to contractor Fleetwood withheld retainage, delay damages, and compensation for extra work performed because of a concealed condition. Gregory–Edwards, one of the subcontractors, also appeals from that part of the judgment which denies it attorney's fees from Fleetwood. We affirm the judgment of the trial court.

*Statement of the Case*

On December 13, 1973, Fleetwood submitted his bid on construction of a portion of Phase I of the North Harris County Junior College project, including construction of buildings, roads and a parking lot. The bid documents included working drawings, project manuals, a soil foundation investigation report by Associated Testing Laboratories, plans and specifications and addenda and instructions to bidders. In Addendum No. 1, the College informed bidders that the contract for the other portion of Phase I had been awarded to Marathon–Mischer Company which was to supply compacted fill under the buildings to be constructed in the second contract, and a permanent road and drainage system. The College represented that the compacted fill should be in place by February 15, 1974.

Fleetwood was awarded the contract. He received from the architect a standard notice to proceed (dated January 11) which was followed by another letter from the architect (dated January 14) advising him to request an extension of time because Marathon–Mischer's operations had not yet reached a point at which Fleetwood could begin. Fleetwood requested the extension of time on January 16 and specifically stated that it was his understanding that the Marathon–Mischer work would be completed by February 15 as originally anticipated. He was officially notified by the architect that his start–up would be further delayed until the first week in April. Fleetwood responded, reminding the architect that he needed to begin work as soon as possible due to the automatic wage increases and daily material price changes. On March 6, Fleetwood moved equipment onto the construction site and discovered that the soil was not strong enough to support the equipment. The architects called in a soil testing laboratory (Murillo) which found the soil to be incapable of being compacted to a firm density and further found the cement stabilization required by Addendum No. 7 to be unsatisfactory in producing a firm subgrade.

On March 19, Fleetwood notified the architects that Marathon–Mischer had not yet completed its work to the point that Fleetwood could commence its operations on the building and that it could not resume work on the parking lot and paving subgrade until the architects had reached a decision on the Murillo report. Fleetwood stated that the extensive delay was due to no fault of his and that he could not be expected to absorb the extra expense caused by the delay. In response, the architect suggested that Fleetwood wait four to six months for the soil to dry out. On April 3, Fleetwood offered to rescind the contract, asking payment for costs and losses, for the purpose of allowing the owner to rebid the project after the soil–drying period. On April 12,

the architect issued an authorization to proceed with cement stabilization of the roadbed according to Addendum No. 7. The subcontractor Richmond Road proceeded, unsuccessfully, and shortly thereafter the architect advised Fleetwood to stop. On May 20, Fleetwood wrote the architect, reciting the failures and delays, and listed expected extra costs and damages. On May 24, Fleetwood wrote to the College stating that he intended to perform the contract but that he was filing suit for damages and extra costs.

On June 18, Fleetwood was notified that the owner had accepted Marathon–Mischer's building fill and that Fleetwood was to proceed with work on the buildings. Fleetwood ordered an inspection of the fill, as required for his protection under the General Conditions of the contract (AIA Document A201). The testing laboratory (Southwestern) rejected the fill as failing to meet contract specifications. The architect was notified of the problem; he ordered Murillo and Southwestern to run side–by–side tests on the building fill. Murillo also found that the fill failed to meet contract specifications. The architects rescinded their previous order for Fleetwood to begin work on the building.

On July 11 the Board of Regents discussed the problems of the fill with Hinshaw, the consulting structural engineer. Hinshaw prepared plans for a French drain and for recompacting of the top twelve inches of the fill. A third soil testing laboratory (McClelland) was asked to conduct additional soil tests and reported that the fill was in compliance with the contract specifications. On July 24, the architect wrote Fleetwood advising him of the McClelland report and the Board's decision to have Fleetwood begin construction at once.

Fleetwood began construction on the fill August 1 and immediately encountered numerous problems. Because of the five and one–half month delay, Fleetwood poured concrete slabs during some of the winter months, having to keep the concrete heated or covered.

In the spring of 1975, Fleetwood hired Southwestern to test the subsoil to determine whether the roads and paving could be put in to meet specifications. Southwestern made reports in April, May, June and September of 1975, stating each time that the subsoils could not be compacted because of their saturated condition.

On November 18, 1975, Fleetwood notified the architects that he intended to engage in extra work to stabilize the six inches below the pavement and that such work was being done under protest. He began work on the subgrade, digging 2 to 3½ feet and recompacting. The subgrade was brought up to compaction standards as required by the specifications. The paving subcontractor, Richmond Road, tore up Fleetwood's subgrade, disced and scarified two to three feet deep and put in flue dust, a form of cement stabilization.

On January 26, 1976, the College's attorney represented to Fleetwood that the college president had advised that the items remaining to be performed under the contract were not significant. He further represented that the College would release to Fleetwood retainage for him and the subcontractors if they would agree to make no claims for delay of other additional compensation. Several subcontractors received their share of the retainage as a result of agreeing to this condition, but those who pursued their claims for damages did not.

On January 27, the architect wrote Fleetwood, detailing the requirements for a final certificate of payment, specifically naming certain record drawings and affidavits. At that time, suit for damages (in which several of the subcontractors were intervenors) was pending in the district court. Trial was had before the court without a jury, and the court entered extensive findings of fact and conclusions of law.

*Introduction*

At the outset of any discussion of points on appeal, we would like to point out that in some instances it has been difficult to correlate the listed points of error with the real points raised in the discussion and ar-

gument portions of the brief as required by Tex.R.Civ.P. 418(e). However, except where no argument was included and no authorities cited, we have undertaken to pass on all points raised in all parts of the College's brief.

## I.  Delay Damages

The College complains that the trial court erred as a matter of law in characterizing the College's delay as a breach of contract and in awarding damages based thereon. At trial Fleetwood attempted to show that it was delayed by (1) Marathon–Mischer's lack of diligence in constructing the building fill and the College's failure to require Marathon–Mischer to meet the February 15 deadline, and (2) by the College's concealment of the subsurface water problem.

### A.  Starting Date

■ The College claims that it is not responsible for damages due to Marathon–Mischer's lack of diligence since, for Fleetwood to recover, Fleetwood must prove that the College was responsible for the act or omission which caused the delay or hindrance.  City of Houston v. R. F. Ball Construction Co. Inc., 570 S.W.2d 75, 77 (Tex. Civ.App.–Houston [14th Dist.] 1978, writ ref'd n.r.e.).  We accept appellant's authority but hold that Fleetwood proved that the College was responsible for causing the delay.

■ The trial court found that the College intended for bidders to rely on February 15 as the starting date, knowing that the starting date would affect the amount of their bids.  The trial court also found that the College failed to require Marathon–Mischer to complete its work by February 15.  These findings, supplemented by the presumed finding (authorized by Tex.R. Civ.P. 299) that the College's failure to require completion was reasonable, are all supported by the evidence and establish that the College was responsible for the act or omission which caused the delay, as required by R. F. Ball Construction, supra.

■ We find no error in the trial court's characterization of the delay as a breach of contract.  We find support for this holding in Anderson Development Corp. v. Coastal States Crude Gathering Co., 543 S.W.2d 402 (Tex.Civ.App.–Houston [14th Dist.] 1976, writ ref'd n.r.e.) in which we held that a failure to supply a proper right of way as required by the contract constituted a breach for which damages could be recovered.  The facts in Anderson Development, supra, are analogous to the facts in this case, and we hold that the same rule of law applies to this case.

### B.  Concealed Condition

■ Similarly, Fleetwood proved that the College was the cause of the delays associated with the concealed condition when it proved (and the trial court so found) that the architects knew of the flow of subsurface water and did not inform Fleetwood or other bidders, and that the College intended that the bidders rely on the faulty recommendations in the soil report to prepare their bids.  These findings are amply supported by the evidence.

## II.  Extra Work

The College also claims that Fleetwood is not entitled to recover for additional costs incurred by doing extra work as a result of the discovery of the "concealed condition." The contract had an article on "Changes in the Work" which included special provisions for concealed conditions and claims for additional costs.  The provision governing concealed conditions reads as follows:

> 12.1.6  Should concealed conditions encountered in the performance of the Work below the surface of the ground be at variance with the conditions indicated by the Contract Documents or should unknown physical conditions below the surface of the ground of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this Contract, be encountered, the Contract Sum shall be equitably adjusted by Change Order upon claim by either party made within twenty days after the first observance of the conditions.

## A. *Knowledge*

■ The College maintains that the subsurface water problem was not a concealed condition and bases that claim on evidence that Fleetwood should have known of the moisture problem because (1) it was common knowledge in the construction industry that the soil (silty sand over hardpan) in North Harris County naturally trapped in moisture, (2) Fleetwood did not sufficiently inspect the site as the contract required, and (3) the soil report adequately notified Fleetwood of the potential problem. These contentions are maintained in the face of numerous findings of fact to the contrary which are amply supported by the evidence.

## B. *Damages*

■ The College argues that the trial court erred in characterizing the soil report as a contract document, but fails to take into account the fact that the recommendations of the soil report were incorporated into the specifications which irrefutably were contract documents. The College argues also that Fleetwood was not entitled to rely on the specifications. For authority, it cites the line of cases beginning with *Lonergan v. San Antonio Loan & Trust Co.*, 101 Tex. 63, 104 S.W. 1061 (1907) which stands for the proposition that contractors accept a contract and its plans and specifications at their peril and that the plans and specifications constitute no guarantee of suitability for the proposed construction. We note, however, further language in *Lonergan* :

> If there be any obligation resting upon the [owner,] as guarantor of the sufficiency of the specifications, it must be found expressed in the language of the contract, or there must be found in that contract such language as will justify the court in concluding that the parties intended that the owner should guarantee the sufficiency of the specifications to [the contractor.]

*Id.* 104 S.W. at 1066. In *Lonergan* there was no express contractual provision. In the instant case there was:

> 4.2.1 The Contractor shall carefully study and compare the Contract Documents and shall at once report to the Architect any error, inconsistency or omission he may discover. The Contractor shall not be liable to the Owner or the Architect for any damages resulting from any such errors, inconsistencies or omissions in the Contract Documents.

Fleetwood complied with the requirements of this provision by notifying immediately the architect that the soil condition was not as he had thought and that the specifications did not require the kind of work which must be done for preparation of the subgrade. This evidence is bolstered by Murillo's report which pointed out to the College that the specifications in Addendum No. 7 for cement stabilization would not produce a firm subgrade. It is apparent from this evidence, and from other evidence considered by the trial court, that the parties to the contract intended that the owner guarantee the sufficiency of the specifications.

*Lonergan* and its progeny are also distinguishable because of circumstances in the instant case indicating "unfairness." *See* 104 S.W. at 1065. The trial court found that the architects knew of the subsurface water flow problem and concealed it from the bidders because they knew that knowledge of such condition would cause higher bids. The trial court further found that the College intended that the bidders rely on the soil report in calculating their bids. These findings are supported by the evidence.

Claims for additional costs or extra work due to concealed conditions are governed by the following provision of the contract:

> 12.2 CLAIMS FOR ADDITIONAL COST
>
> 12.2.1 If the Contractor wishes to make a claim for an increase in the Contract Sum, he shall give the Architect written notice thereof within twenty days after the occurrence of the event giving rise to such claim. This notice shall be given by the Contractor before proceeding to execute the Work, except in an emergency

endangering life or property in which case the Contractor shall proceed in accordance with Subparagraph 10.3.1. No such claim shall be valid unless so made. If the Owner and the Contractor cannot agree on the amount of the adjustment in the Contract Sum, it shall be determined by the Architect. Any change in the Contract Sum resulting from such claim shall be authorized by Change Order. Appellant contends that Fleetwood did not comply with this provision, evidenced by the lack of any change orders authorizing the extra work and adjustments in the contract sum. The trial court found that Fleetwood gave adequate notice of the changes in the work required by the discovery of the concealed condition and that the College failed to issue a change order or to order a change in the specifications which would accommodate the saturated condition. These findings are well supported by the evidence.

■ We hold that the College breached the contract and thereby relinquished its procedural rights concerning change orders and claims for additional costs when it refused to acknowledge the "concealed condition." Fleetwood was not required to wait for an adjudication on the question of whether a concealed condition existed before resuming work on the contract. At the point of breach, when the College failed to change its specifications to conform to the actual soil condition, Fleetwood was given the choice of stopping work and recovering under the contract or continuing to work and claiming damages caused by the breach. Fleetwood chose to continue and sue for damages, and the College cannot now insist on enforcement of the claims provision. *See Board of Regents of the University of Texas v. S & G Construction Co.*, 529 S.W.2d 90, 96 (Tex.Civ.App.–Austin 1975, writ ref'd n.r.e.).

## III.  *Retainage*

Appellant also contends that Fleetwood should not recover retainage for itself and the subcontractors until they have complied with the contract which requires an affidavit that all indebtedness connected with the

contract work has been paid. The College contends that Fleetwood failed to provide releases on bonds for the subcontractors, "as built" drawings and a roofing warranty as required by the contract.

## A.  *Waiver*

■ Fleetwood urged waiver and unconscionability as an excuse for not providing these items. Fleetwood tried to show, and the court so found, that the College's release of retainage for those subcontractors who agreed not to claim for delay damages or other compensation was a waiver of any right the College had to insist on a certificate of final payment from the architects as a prerequisite to final payment. We agree. The trial court found, and its finding was supported by the evidence, that Fleetwood was ready to perform under the contract provision but did not do so because of the College's requirement that Fleetwood and the rest of the subcontractors release all their claims for damages before the College would tender retainage. We agree with the trial court that this constituted unconscionable conduct which estopped the College from relying on the provision covering final payment which required that Fleetwood provide certain items to the architect before the certificate for final payment would be issued.

■ In response to the College's argument that Fleetwood's waiver claim is barred because it was not affirmatively pled, we hold that it was not necessary for Fleetwood to allege waiver or estoppel in a new pleading. The College was sufficiently put on notice of Fleetwood's claims under waiver and estoppel by the facts alleged in Fleetwood's petition.

## IV.  *Damages*

Finally, the College contends that Fleetwood's proof of damages was inadequate as a matter of law.

## A.  *Hearsay*

■ First, the College contends that Fleetwood's proof was inadmissible hearsay

because the records were not properly qualified as business records. Tex.Rev.Civ.Stat. Ann. art. 3737e (Vernon Supp.1980), which is controlling on this question, requires that a record, to be competent, must be made (1) in the regular course of business, (2) by an employee or representative of such business having enough personal knowledge of the event to make such record, and (3) at or near the time of the event.

■■■ The business records introduced by Fleetwood to support its claims for damages did not all originate in Fleetwood's offices nor were they all prepared by Fleetwood personnel. There is evidence, however, that the records were transmitted through Fleetwood employees who had personal knowledge of the events recorded sufficient to ascertain the veracity of information contained therein. We hold that the records were properly qualified as business records.

## B. *Privity of Contract*

■■■ The College also argues that the subcontractors may not recover damages from the College because of a lack of privity of contract between them and the College. We find this contention to be a misconstruction of the actual contract terms. The subcontractors sued as intervenors to recover their damages through Fleetwood, as prescribed by the contract provision:

5.3.1 All work performed for the Contractor by a Subcontractor shall be pursuant to an appropriate agreement between the Contractor and the Subcontractor (and where appropriate between Subcontractors and Sub–subcontractors) which shall contain provisions that:

.     .     .     .     .

.4   require that all claims for additional costs, extensions of time, damages for delays or otherwise with respect to subcontracted portions of the Work shall be submitted to the Contractor . . . in sufficient time so that the Contractor may comply in the manner provided in the Contract Documents for like claims by the Contractor upon the Owner.   .   .   .

Suit for recovery of damages through the contractor does not purport to create any contractual relation between the College and the subcontractors. The argument and authorities regarding privity of contract are inapposite.

## V.   *Prejudgment Interest*

■■■Appellant has presented one point of error on prejudgment interest but has supported it with no argument or authorities. Therefore, we refuse to consider the point.

## VI.   *Subcontractor's Recovery from Contractor*

Appellant Gregory–Edwards contends that the trial court erred in not awarding it attorney's fees, retainage and interest against Fleetwood or against Fleetwood's bonding company. We find this argument to be without merit.

■■■ Gregory–Edwards cites as its authority *Wisznia v. Wilcox*, 438 S.W.2d 874 (Tex.Civ.App.–Corpus Christi 1969, writ ref'd n.r.e.), which stands for the proposition that when payment of a debt is fixed on the occurrence of a future event as a condition precedent to payment, and when the future event does not occur, payment must nevertheless be made within a reasonable time. This rule applies, however, only when the parties so intended. *Accord Wisznia.* In our case we have clear evidence that the parties intended that payment be made only after full payment to the contractor:

.   .   .   Contractor may, at its option on each payment, retain   .   .   .   the percentage specified in the Contract Documents, of each estimate until final payment [which final payment shall be made *after* completion of the work covered by this contract and written acceptance thereof by the Architect, and *full payment therefor by Owner*].   .   .   .

(Excerpt from paragraph 24(a) of the subcontract between Gregory–Edwards and Fleetwood; emphasis added.)

Also, the fact that Gregory–Edwards chose not to obtain its retainage from the College by means of a release is some evidence that it intended the time for adjudication of the legal claims to be a "reasonable time" as required by *Wisznia*.

The trial court recognized the contracts as binding and specifically found that Fleetwood was at all times ready to obtain and convey final payment to Gregory–Edwards but was prevented from doing so because of the College's condition of full release. We may presume a finding that Gregory–Edwards intended that a "reasonable time" for receipt of payment meant until final adjudication of the claims for damages. Tex.R. Civ.P. 299.

Having considered all points of error brought by appellants North Harris County Junior College District and Gregory–Edwards and found them to be either without merit or grounded in harmless error, and having further considered the "areas" of error brought to our attention by the College, we affirm the judgment of the trial court.