# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 12, 2016

Lyle W. Cayce
Clerk

Nos. 15-10390

DALLAS/FORT WORTH INTERNATIONAL AIRPORT BOARD,

      Plaintiff - Appellant

v.

INET AIRPORT SYSTEMS, INCORPORATED; MICHAEL F. COLACO; HARTFORD FIRE INSURANCE COMPANY, INET AIRPORT SYSTEMS, L.L.C., As Successor in Interest to Inet Airport Systems, Incorporated,

      Defendants - Appellees

---------------------------

CONSOLIDATED WITH 15-10600

THE DALLAS/FORT WORTH INTERNATIONAL AIRPORT BOARD,

      Plaintiff - Appellant

v.

INET AIRPORT SYSTEMS, INCORPORATED; INET AIRPORT SYSTEMS, L.L.C., As Successor in Interest to Inet Airport Systems, Incorporated,

      Defendants - Appellees

Appeals from the United States District Court
for the Northern District of Texas

Nos. 15-10390, 15-10600

Before CLEMENT and HAYNES, Circuit Judges, and GARCIA MARMOLEJO, District Judge.*

HAYNES, Circuit Judge:

The Dallas/Fort Worth International Airport Board ("DFW") appeals the final judgments of the district court against DFW in favor of INET Airport Systems, Inc. ("INET"),[1] Michael F. Colaco, and Hartford Fire Insurance Company ("Hartford").  The cross-motions for summary judgment and this appeal relate to a contract between DFW and INET for construction at DFW Airport.  The parties accuse each other of breaching the contract following a dispute regarding the proper configuration and installation of rooftop air handling units for passenger boarding bridges in Terminal E of the DFW Airport.  In addition to INET, DFW sued Colaco individually as an officer and director of INET, and Hartford as the bonding agency for INET on the contract at issue.  INET counterclaimed for breach of contract against DFW, claiming entitlement to money DFW did not pay INET that INET alleged it was owed under their agreement, as well as attorneys' fees and legal expenses.  INET also counterclaimed for unjust enrichment and money had and received against DFW.

The district court granted summary judgment against DFW on INET's affirmative defenses of excuse and prior material breach of the contract by DFW and also dismissed claims against Colaco.  The court dismissed DFW's claims against Hartford based on Hartford's statute of limitations defense. Finally, the district court denied in part DFW's motion for summary judgment,

---

* District Judge of the Southern District of Texas, sitting by designation.

[1]  In its summary judgment opinion and after a bench trial to determine the damages owed to INET, the district court found that INET Airport Systems, Inc., was succeeded by INET Airport Systems, L.L.C., the successor in interest to INET.  Michael Colaco dissolved INET Inc. as its sole shareholder and director, selling its assets, including amounts receivable under INET Inc.'s contract with DFW, to INET L.L.C.  We refer to both entities as "INET."

2

Nos. 15-10390, 15-10600

which claimed that INET breached the contract, and granted DFW's motion in part as to INET's counterclaims of unjust enrichment and money had and received. DFW timely appealed these final judgments, and those appeals were consolidated before us.[2]

Because we find that material factual disputes remain unresolved, we REVERSE the district court's grant of summary judgment in favor of INET on INET's claims of excuse and prior material breach of the contract by DFW, and REMAND for trial. We also REVERSE and REMAND the district court's grant of summary judgment for Hartford, as disputes of material fact remain over whether DFW filed suit against Hartford within the statute of limitations. Finally, we VACATE the district court's subsequent final judgment awarding damages to INET because it was based on the district court's summary-judgment determination that DFW should be liable to INET.

## I. Jurisdiction and Standard of Review

We have jurisdiction over DFW's appeals of the final orders of the district court under 28 U.S.C. § 1291. We review a district court's interpretation of a contract de novo. *See Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 712 (5th Cir. 2005) (*ICC*). The contract in this case is governed by Texas law, under which contract interpretation and whether a contract is ambiguous are questions of law. *Id.* In interpreting a contract, courts must "ascertain and give effect to the parties' intentions as expressed in the writing itself," considering the entire writing and seeking to "harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012)

---

[2] The parties do not mention or challenge the district court's dismissal of claims against Colaco, nor its grant of DFW's motion for summary judgment as to INET's counterclaims of unjust enrichment and money had and received. We do not address those claims in this appeal. *See Hughes v. Johnson*, 191 F.3d 607, 613 (5th Cir. 1999).

Nos. 15-10390, 15-10600

(citations omitted).  We review de novo the district court's decision on summary judgment.  *Cooley v. Hous. Auth. of City of Slidell*, 747 F.3d 295, 297 (5th Cir. 2014).

## II.  Background

### A.  Factual Background

DFW and INET entered into Contract No. 9500377 (the "Contract") in August 2009 for a project in Terminal E of DFW Airport, in which pre-conditioned air and rooftop air handling units ("Rooftop Units") were to provide conditioned air (cooling and heating) to passenger boarding bridges and aircrafts parked at terminal gates.  INET won the Contract through a competitive bidding process and agreed to follow the Contract's terms, plans, and specifications for the construction work.  In submitting its bid proposal, INET certified that its proposal constituted prima facie evidence that it had examined "the site of the proposed work, the proposal, plans, specifications, and contract forms," and satisfied itself as to the materials furnished, requirements of the Contract, plans, specifications, and site conditions.

The plans and specifications for the Contract included detailed drawings, the precise Rooftop Units and parts to be used, approved manufacturers, and performance requirements.  Under the Contract and these plans, INET was obligated to install operational Rooftop Units that were required to use "30% ethylene glycol/water" supplied by DFW Airport's piping system.  INET also agreed to provide schematic drawings of control sequence operations and the required components for a fully operational control sequence that would "provide auto defrost of the coils" within the Rooftop Units, through which the ethylene glycol/water ("EG Water") would cycle.

Campos Engineering ("Campos") prepared the design for the project for DFW, including the plans and specifications.  INET was not allowed to substitute products or designs for those agreed upon in the Contract documents

4

without authorization from DFW. The Contract also contained provisions requiring INET to alert DFW immediately to any "apparent error or omission in the plans or specifications" so that DFW could make a final decision about how to proceed. If the completion of the Contract required extra work for which payment had not been delineated, the Contract provided that this extra work should be covered by "a written change order" issued by DFW with "agreed prices for performing the change order work." DFW was to reject any claim for payment not covered by written change order or supplemental agreement.

Trouble arose when INET expressed concern to DFW that the Rooftop Units specified in the plans and selected by INET in the Contract might not function correctly with the EG Water mixture. INET informed DFW of this potential problem during the construction kick-off meeting on October 14, 2009—specifically, that the EG Water supplied by DFW's pipes would be at sub-freezing temperatures, causing ice to build up on the outer surface of the Rooftop Unit coils and keeping the coils from performing as required. After receiving no immediate response to this concern, INET submitted a "Request for Information," or "RFI," asking how it should proceed (hereinafter, "RFI-2").

DFW, Campos, and INET corresponded about this issue through extensive discussions that resulted in two proposals for how to add control sequences ("Control Sequence Proposal") or revised piping ("Revised Piping Proposal") to the Rooftop Units to prevent potential defects. The record does not indicate that the parties ever reached any agreement on whether to adopt these proposals or how to proceed. Eventually, DFW notified INET that INET had failed to meet the substantial completion deadline and that DFW would begin assessing liquidated damages. DFW declined to pay at least one invoice submitted by INET after this date, and in April 2012, DFW made a claim against Hartford on the performance bond. DFW, INET, and Hartford corresponded throughout 2012. DFW had the remaining work on the Rooftop

Units completed by a substitute contractor by contract dated July 9, 2013.

In June 2012, DFW took official action related to the Contract with INET. The parties dispute whether this action terminated the Contract and if not, when the Contract was terminated or abandoned. Timing is relevant because DFW filed suit on August 5, 2013, and the district court dismissed DFW's claims against Hartford as barred by Texas's one-year statute of limitations for suits on performance bonds. *See* TEX. GOV'T CODE § 2253.078.

## B. *Procedural History*

In response to the parties' various motions, the district court granted DFW's motion for summary judgment in part, holding INET could not prevail on its counterclaims for unjust enrichment and money had and received. The district court determined the case turned on which party first breached the Contract and concluded the Contract placed the risk of defects in the designs and specifications on DFW under Texas law, that DFW had admitted the designs and specifications were defective, and that DFW therefore breached the Contract by failing to acknowledge the defects and issue appropriate change orders. The district court granted in part INET's motion for summary judgment, on its affirmative defenses of excuse and prior material breach of the Contract by DFW,[3] dismissed DFW's claims against Hartford, Colaco, and INET from the case, and after a bench trial on damages and attorneys' fees, issued a final judgment awarding INET $1,293,728.74 in damages and fees, plus interest.

## III. Discussion

The dispute between the parties turns on where the Contract allocated

---

[3]    Although the district court noted that INET did not seek judgment on its counterclaim for breach of contract, the district court observed that "DFW does not dispute that it is withholding monies on work that was completed by INET" and urged the parties to "agree on the amounts withheld." After a bench trial, the district court apparently awarded INET that agreed amount, plus attorneys' fees and costs.

the risk of defective plans and specifications, whether the plans and specifications were in fact defective, and what was required of each party once INET claimed it found a defect that would prevent its performance.  We conclude it was error to grant summary judgment for INET on the basis that DFW first breached the Contract.  The record contains disputes of material fact regarding which party prevented performance by failing to fully cooperate in arriving at a solution once the parties discovered defects.

## A.  *Defective Plans and Specifications and the Contract's Allocation of Risk*

The district court correctly concluded there was no dispute of material fact regarding whether the plans and specifications were defective and had to be changed for the Rooftop Units to function properly.  We therefore must determine how the Contract allocated the risk of defective plans and specifications.  The district court concluded that the Contract allocated this risk to DFW and that DFW breached the Contract by insufficiently cooperating with INET to resolve problems created by the defective plans and specifications.  We conclude that while DFW partly bore the risk of defective plans and specifications under this Contract, the language of the Contract requires both parties to participate in resolving such defects.

Texas law allows contracting parties to allocate the risk of defective designs, plans, and specifications to an owner (in this case, DFW), rather than the contractor (INET), but this "require[s] contractual language indicating an intent to shift the burden of risk to the owner." *ICC*, 407 F.3d at 720; *see also Millgard Corp. v. McKee/Mays*, 49 F.3d 1070, 1071–73 (5th Cir. 1995).  The language of this Contract allocates the risk of defects at least partially to DFW, in that it requires DFW to cooperate through a change order or other actions in the event that INET brings a discrepancy to DFW's attention.  For example,

Special Provision[4] 6.0(D), under the title "Warranty of Construction," provides:

> Unless a defect is caused by the negligence of the Contractor or subcontractor or supplier at any tier, the Contractor shall not be liable for the repair of any defects of Owner furnished material or design furnished by the OWNER or for the repair of any damage that results from any defect in material or designs furnished by the OWNER.

Special Provision 31.0 states:

> In case of conflict, discrepancies, errors or omissions among the various Contract documents, the matter shall be submitted immediately by Contractor to the Construction Manager for decision, and such decision shall be final. Any Work affected by such conflicts, discrepancies, errors or omissions which is performed prior to the Construction Manager['s] determination shall be performed at the Contractor's risk.

These provisions seem to allocate the risk of defects to DFW. Yet, the Contract allocated some duties to INET as well, duties that required INET to cooperate or take other actions in this case to help resolve the discrepancy between the Contract's requirements and the designs and specifications. Various General Provisions support INET's duties to: (1) inspect the plans and specifications and bring up discrepancies during the bidding process;[5] (2) otherwise assume full responsibility for the compatibility of equipment and parts;[6] and (3) fill in details necessary to complete the work as specified,

---

[4] The Contract provides that its provisions are intended to be complimentary, but in case of a discrepancy, Special Provisions govern over General Provisions. We thus begin with the Special Provisions of the Contract.

[5] General Provision 20-6 of the Contract clearly places a duty on INET to make a pre-bid inspection and to satisfy itself about the requirements of the plans and specifications relative to the Contract's requirements.

[6] INET was to provide air handling units "complete with ethylene glycol/water cooling/heating coils" and "related controls," including providing "detailed schematic drawings showing all components and their arrangement and their relation to the control system," and a "sequence of operation description of each control system."

including "[n]ecessary controls to provide auto defrost of the coils."[7] INET assumed "sole responsibility" for compliance with the Contract documents, and "full responsibility for satisfactory operation of all component parts of the mechanical systems to assure compatibility of all equipment and performance of the integrated systems in accordance with the requirements of the specifications." Furthermore, INET had to strictly conform its performance to the designs, plans, and specifications of the Contract.[8]  Yet, the Contract allowed INET to submit potential errors or discrepancies to DFW and obtain approval for a change in the design.[9]

Crucially, if the engineer or DFW determine changes are necessary after INET points out a potential error, *the Contract provides for the parties to agree upon how to adjust for the change.*  DFW can make alterations to the work under General Provision 40-2, but such alterations "shall be covered by 'Change Orders' issued by [DFW]," and must be in writing where the orders would change the Contract's price.  The Contract defines a change order as "[a] written order to [INET] covering changes in the plans, specifications or proposal quantities and establishing the basis of payment and contract time adjustment, if any, for the work affected by such changes."  The Contract

---

[7] INET was to provide "all other required components to accomplish the specific control sequence specified" in the Contract and "all other required components for a complete operating system."

[8] These duties were specified in General Provision 60-7, requiring strict conformance with "the contract, plans, or specifications" for all materials, or else they "shall be rejected," and in General Provision 90-7, entitled "PAYMENT WITHHELD," stating that "[DFW] may withhold all or part of any payment otherwise due [to INET]" for "failure to execute the work in strict accordance with the Contract Documents."

[9] The Contract also provides that the engineer has authority to "decide any and all questions which may arise as to the quality and acceptability of materials furnished, work performed, and as to the manner of performance," and "shall decide all questions which may arise as to the interpretation of the specifications or plans relating to the work, [and] the fulfillment of the contract on the part of [INET]." The "engineer" referred to by the Contract is apparently Campos, DFW's engineering firm; Bill Kumpf was the "engineer of record."

elsewhere notes that if changes affect the contract price, they may be made "only by written Contract Change Order, approved and executed by both [DFW] and [INET]." Therefore, any change order to adjust for the defects discovered by INET required the assent of both parties.[10]

In sum, the Contract in this case contains a mixture of provisions that place the risk of defects on both DFW and INET. INET agreed that it would provide a control sequence and other mechanisms to ensure defrosting of the coils within the Rooftop Units; that it had inspected the plans and specifications and would point out potential problems before bidding; that all equipment would be compatible with DFW's system; and that it would fill in details as necessary. INET discovered a defect in the plans and specifications, which contained very detailed requirements that INET was not free to disregard or redesign without DFW's approval. Therefore, DFW also agreed to provide change orders if INET pointed out defects in the plans, and the Contract allows DFW and INET to resolve any such defects discovered after the Contract's execution by mutual agreement. The district court correctly concluded DFW had a duty to cooperate with INET and issue a change order if necessary to correct defects. However, INET's agreement was also required for such a process under the Contract, and INET had duties that required it to cooperate in finding a solution to any defects. We therefore address whether there are disputes of material fact in the record regarding which party breached the Contract by failing to cooperate and find a solution to the defect.

---

[10] Other courts have described change orders as agreements requiring mutual assent. *See, e.g.*, *Roberts, Taylor & Sensabaugh, Inc. v. Lexington Ins. Co.*, No. H-06-2197, 2007 WL 2592748, at *8 (S.D. Tex. Sept. 5, 2007); *cf. Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 228–29 (Tex. 1986) ("Parties have the power to modify their contracts. A modification must satisfy the elements of a contract: a meeting of the minds supported by consideration."). The language of this Contract and underlying legal principles make clear that INET's assent was required before the plans and specifications could be revised in this case. We reject INET's argument that DFW had the power and obligation to order such revisions unilaterally.

Nos. 15-10390, 15-10600

## B. Breach of the Contract

Texas law excuses a party's performance under a contract when the other party's breach prevents its performance. *See, e.g.*, *Transverse, L.L.C. v. Iowa Wireless Servs., L.L.C.*, 617 F. App'x 272, 277 (5th Cir. 2015);[11] *L. H. Land Painting Co. v. S & P Constr., Inc.*, 516 S.W.2d 14, 16 (Tex. Civ. App.—Fort Worth 1974, writ dism'd).[12]  Texas courts have held that an owner may not ignore defects recognized by a contractor, but must cooperate to modify the contract when necessary. *Cf. N. Harris Cty. Junior Coll. Dist. v. Fleetwood Constr. Co.*, 604 S.W.2d 247, 254 (Tex. Civ. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.) (finding an owner breached the contract by refusing to alter specifications related to a concealed condition the contractor pointed out); *Emerald Forest Util. Dist. v. Simonsen Constr. Co.*, 679 S.W.2d 51, 54 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) ("If appellee had notified both the engineer and the owner in writing of the wet sand conditions, it would have been relieved of liability." (emphasis omitted)).  From this authority, the district court concluded there were no disputes of material fact regarding whether DFW first breached the Contract by failing to agree to a solution to the defective plans and specifications.  We disagree.

The parties discussed two possible modifications of the plans and specifications that might have addressed the defects INET discovered, known

---

[11] Although *Transverse* is not "controlling precedent," it "may be [cited as] persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (citing 5TH CIR. R. 47.5.4).

[12] *See also Nitram, Inc. v. Cretan Life*, 599 F.2d 1359, 1371 (5th Cir. 1979) ("It is a general principle of contract law that if one party to a contract prevents or makes impossible performance by the other party, the latter's failure to perform will be excused and the offending party will not be permitted to recover damages for nonperformance.  But this principle has no application when the party whose performance was prevented entered into the contract fully aware of the obstacles which would prevent his performance." (citations omitted)); *Owens v. William H. Banks Warehouses, Inc.*, 202 F.2d 689, 692 (5th Cir. 1953) (same).

as the Control Sequence Proposal and the Revised Piping Proposal. The record is clear that INET did not agree to the Control Sequence Proposal, as INET admits in its brief.[13] In March 2010, Campos sent DFW another possibility, the Revised Piping Proposal, which DFW forwarded to INET that same month.

A dispute of material fact remains regarding whether INET rejected the Revised Piping Proposal outright or hindered the process of agreeing to this or another solution. INET sent DFW requests for information related to the Revised Piping Proposal in April 2010, requesting details and formal documentation from DFW so that INET could "price this change." DFW responded with information about some of the technical details of the Revised Piping Proposal, but the record does not show that DFW or INET ever formally priced this change or modified their Contract to incorporate the Revised Piping Proposal. Based on its requests for information, INET argues DFW breached the Contract by failing to cooperate in issuing a change order and incorporating the Revised Piping Proposal into the Contract.

However, DFW argues INET rejected the Revised Piping Proposal, pointing to correspondence between INET and DFW.[14] For example, in April

---

[13] INET states that it "informed DFW that the changes to the control sequence, without more, would not be sufficient to ensure that the units would perform as required without freezing."

[14] INET objects to much or all of this evidence as self-serving and not contemporaneous. *Cf. Anco Insulations, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 787 F.3d 276, 281–82 (5th Cir. 2015). We find these objections meritless. Evidence proffered by one side to support or defeat a motion for summary judgment will inevitably appear "self-serving." Nevertheless, we have accepted testimony like what is in the record in this case as giving rise to inferences that create disputes of material fact when properly construed for the nonmoving party. *See, e.g., In re Yarn Processing Patent Validity Litig.*, 498 F.2d 271, 287 (5th Cir. 1974); *see also C.R. Pittman Constr. Co. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443–44 (5th Cir. 2011) (holding summary judgment was improper because, although "self-serving," affidavits were not wholly conclusory and were based on personal knowledge). We do so here. We also reject INET's argument that Campos instructed INET to proceed with the two different proposals at issue, placing INET in a difficult situation without a formal change order. The record evidence does not suggest beyond dispute that Campos or DFW gave INET a unilateral and binding instruction to incorporate either of the

2010, INET sent a letter to DFW requesting approval to spend over $60,000 to fix the defect by installing alternate units.  In June 2010, INET sent another letter to DFW indicating that "[a]s a result of the ongoing discussions" regarding the units, INET proposed alternative side-mounted units at an additional cost of just over $20,000.  DFW also highlights deposition testimony by a DFW employee that INET "never agreed" to the Revised Piping Proposal.  This non-conclusory evidence creates a dispute of material fact on this issue.

Significant evidence in the record suggests that the parties attempted to agree about how to address INET's concerns, and that INET and DFW both took strong positions about the necessary solution.  In these circumstances the Contract required both parties to participate in resolving defects.  Any contractual modification or change order required the mutual assent of the parties, and questions of mutual assent are fact based.  Sifting through the evidence to determine whether the parties reached agreement on a contractual modification is a task ill-suited for summary judgment on this record.  For these reasons, and because disputes of material fact remain regarding whether DFW or INET breached the Contract by preventing an agreement about how to address defects in the Contract's plans and specifications, we reverse the district court's grant of summary judgment for INET.

## C.  *Hartford's Statute of Limitations Defense*

The district court dismissed DFW's claim against Hartford based on Hartford's affirmative defense that the claim was barred by the statute of limitations.  DFW filed suit against Hartford and INET on August 5, 2013.  In Texas, "[a] suit on a performance bond may not be brought after the first anniversary of the date of final completion, abandonment, or termination of the public work contract."  TEX. GOV'T CODE § 2253.078.  The statute of

---

proposals.

limitations would bar DFW's suit if the Contract was terminated or abandoned before August 5, 2012. The district court construed a resolution by the DFW Board as a trigger date for limitations and alternatively found the Contract abandoned "years" before DFW filed suit. We disagree and reverse the district court's grant of summary judgment for Hartford on this claim.

*1. Termination of the Contract*

It is undisputed that on June 7, 2012, the Board passed the following resolution ("Resolution"):

> BE IT RESOLVED BY THE [DFW] BOARD
>
> That the Chief Executive or designee be authorized to terminate Contract No. 950377 . . . and to pursue any other relief to which the Board may be entitled.

On the same document containing the resolution, the "Description" section stated: "This action will terminate Contract No. 9500377 [with INET]." The Action section of the document repeated the language of the Resolution itself just above the bullet-point "Description." Under "Justification," the document says "Board staff recommends the termination of this contract and seeks authorization to pursue any relief to which the Board may be entitled by reason of the contractor's default."

We conclude the Resolution was not self-executing and that it is not beyond dispute that the Contract was terminated or abandoned before August 2012, as Hartford was required to prove to succeed in a motion for summary judgment on its affirmative defense. *See generally Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991) (noting that where the moving party would bear the burden of proof at trial for an affirmative defense, the party must produce evidence that "would entitle it to a directed verdict if the evidence went uncontroverted at trial" (citation omitted)). We construe the DFW Board's Resolution like any other statute, as it is the equivalent of a municipal ordinance. *See generally Bd. of Adjustment of City of San Antonio*

*v. Wende*, 92 S.W.3d 424, 430 (Tex. 2002) ("Courts use the same rules that are used to construe statutes to construe municipal ordinances."); TEX. TRANSP. CODE § 22.074(b)–(c) (providing that a joint airport board operates with "all the powers" of each constituent agency, including respective cities). The language of the Resolution is unambiguous and provides only that the Board gave the CEO *authority* to terminate the Contract. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651–52 (Tex. 2006) (noting that the enacted language is what constitutes the law and that the inquiry asks whether that language is unambiguous). We therefore reverse the district court's conclusion that the Resolution and extraneous evidence showed DFW terminated the Contract through the June 7, 2012, Board Resolution or before August 2012.[15]

### 2. Abandonment of the Contract

The district court concluded in the alternative that INET abandoned the contract long before August 2012, noting in summary fashion that DFW alleged that after October 2010, INET would do no further work on the Contract. As with termination, Hartford has the burden to show the parties abandoned the Contract before August 2012. *See Int'l Shortstop*, 939 F.2d at 1264–65. "'Abandonment' is principally a matter of intention which must be established by clear and satisfactory evidence," and if relying on conduct, "the acts relied upon must be positive, unequivocal and inconsistent with the existence of the contract." *Capitol Steel & Iron Co. v. Standard Accident Ins.*

---

[15] Even apart from the Resolution, we conclude that disputes of material fact remain regarding whether the Contract was terminated before August 2012. Contrary to the requirements for assessing a summary judgment motion, the district court construed inferences in Hartford's favor in relying on vague, contemporaneous statements by DFW employees to conclude that the DFW Board intended to terminate the Contract before August 2012. These statements are insubstantial evidence, if any, of that proposition, and there is evidence to the opposite effect in the record. *See generally Int'l Shortstop*, 939 F.2d at 1265 (noting that when intent is at issue, summary judgment is disfavored because the issue of intent often involves credibility determinations).

Nos. 15-10390, 15-10600

*Co.*, 299 S.W.2d 738, 740–41 (Tex. App.—Amarillo 1952, no writ) (citations omitted).  We discern no such positive, unequivocal conduct that is inconsistent with the existence of a continuing Contract between INET and DFW.  Rather, record evidence creates a fact issue about whether either party intended to terminate or abandon the Contract before August 2012.  Accordingly, we reverse the district court's grant of summary judgment for Hartford and remand for further proceedings.

## IV.  Conclusion

Because disputes of material fact remain, we REVERSE the grants of summary judgment for INET and Hartford and REMAND this case for the claims to proceed to a fact finder.[16]  Since the district court granted INET damages and fees based on its summary judgment rulings, we also VACATE the district court's June 16, 2015, judgment making those awards.

---

[16] We do not reach several other claims the parties mention on appeal that the district court found moot or did not address, including how to resolve INET's affirmative defenses and whether INET violated the Contract through its dissolution and the assignment of the Contract to its successor.  The district court may reach these issues as necessary on remand. We also decline to grant summary judgment for DFW, as it requests, for the same reason that we reverse the grant of summary judgment for INET: namely, disputes of material fact remain regarding the timing and details of which party breached the Contract in this case.