# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 2, 2020

Lyle W. Cayce
Clerk

No. 19-40745

D2 Excavating, Incorporated,

*Plaintiff—Appellee*,

*versus*

Thompson Thrift Construction, Incorporated; Fidelity and Deposit Company of Maryland,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:16-CV-538

Before Stewart, Clement, and Costa, *Circuit Judges*.

Gregg Costa, *Circuit Judge*:

Contracts do not always turn out the way a party expects. Sometimes it takes less time or money to perform than anticipated; other times it takes more. This case is of the latter variety. A subcontractor doing excavation work ended up having to remove a lot more dirt from the construction site than the parties anticipated. The resulting lawsuit over this "excess dirt" led to a judgment for the subcontractor exceeding half a million dollars. The principal issue on appeal is whether the subcontractor was entitled to

No. 19-40745

additional money for the "excess dirt" removal or whether it was stuck with the price the parties agreed to.

## I.

Thompson Thrift Construction, Inc. was the general contractor for a new apartment complex in Corpus Christi.[1] It solicited a bid from D2 Excavating, Inc. for site grading and excavation work. Thompson sent D2 documents which included proposed contract terms, a topographical survey of the site, and the planned final elevations.

The proposed terms included the following language:

> Execution of this Agreement by the Subcontractor is a representation that the Subcontractor has visited the Project site, become familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents. The Subcontractor shall evaluate and satisfy itself as to the conditions and limitations under which the Work is to be performed, including without limitation: (1) the location, condition, layout, and nature of the Project site and surrounding areas; (2) generally prevailing climactic conditions; (3) anticipated labor supply and costs; (4) availability and cost of materials, tools, and equipment; and (5) other similar issues. Accordingly, Subcontractor shall not be entitled to an adjustment in the Contract Price or an extension of time resulting from Subcontractor's failure to fully comply with this paragraph.

---

[1] These facts come from the findings the district court entered after the bench trial.

. . .

> This is a balanced site. It shall be this subcontractor's responsibility to balance site. Change orders for import/export will not be accepted. Consider all spoils from other trades, and create berms where necessary.

A site is "balanced" if the work will not require importing or exporting dirt to achieve the planned elevations. In that case, the dirt need only be transferred within the site.

Despite its representation, Thompson did not actually determine whether the site was balanced. The proposed terms were its standard template for all excavation projects. D2 also declined to investigate the site—two months of heavy rain limited its ability to physically examine the site, and Thompson was eager to begin construction as soon as the rain ceased. Instead, D2 used a software program to determine the site was balanced, after accounting for dirt that other contractors would produce. The inputs for this analysis came from the topographical survey Thompson provided.

After performing its simulations, D2 agreed to do the excavation. Under the final contract, Thompson was to pay D2 $630,000. The parties included the proposed terms that Thompson originally provided to D2 in the contract as an exhibit with slight modifications. The final agreement also anticipated the possibility of modifying the scope of the work and included unit pricing for additional tasks that would be executed as written change orders.

About one month after D2 began excavating, it became clear that the site was not balanced. Excavation was producing a lot more dirt than expected and some would need to be removed from the site. D2 and Thompson disagreed about whose fault the excess dirt was. Thompson argued that the imbalance was due to D2's inaccurate computer analysis,

No. 19-40745

D2's excess import of fill, or D2's overexcavation of the site; D2 countered that the topographical survey was flawed. Regardless of who was responsible for the misestimate, D2 promptly notified Thompson that there was unanticipated dirt that needed to be removed. The parties negotiated and decided that Thompson would cover D2's costs for the additional work. Thompson told D2 it would issue a written change order for the additional work once it was finished so that it would be easier to calculate what it owed.

With Thompson's promise to pay for unanticipated exporting work in hand, D2 continued excavating. In addition to the unexpected exporting of excess dirt, Thompson repeatedly asked D2 to re-excavate and regrade areas that other subcontractors' activity had disturbed. In one case, Thompson's mismanagement of other subcontractors required D2 to excavate the same area six times.

D2 became concerned that Thompson would not actually pay for this work. It began sending fewer employees to the site, which prompted negotiations with Thompson about D2's compensation. Those negotiations were ultimately unfruitful, and Thompson never provided a change order. When it became clear that Thompson was not going to pay additional amounts for the removal of dirt, D2 stopped working. At that point, 98.6% of the excavation was complete.

D2 then sued for breach of contract, quantum meruit, violations of the Texas prompt pay statute, and to foreclose on a statutory and constitutional lien.[2] Thompson, in turn, argued that D2 breached the contract. Thompson filed an unsuccessful motion for summary judgment, which argued that D2 bore the risk that the site might be unbalanced. At the conclusion of a bench

---

[2] D2 sued both Thompson and Fidelity and Deposit Company of Maryland, which had issued an indemnity bond. Fidelity's damages are limited to its bond of $581,605.50.

4

No. 19-40745

trial, the district court held in D2's favor on all claims. It ordered Thompson to pay D2 $81,068.00 for unpaid work under the contract and $257,588.53 for "excess" excavating work. Interest of 1.5%/month was added to those awards starting in May 2016, when payment became due under the Texas prompt payment law. The biggest award of all was for attorneys' fees: $356,080.91.

## II.

We review the district court's findings of fact for clear error, but this appeal largely turns on legal issues of contract interpretation, which we review de novo. *Lyda Swinerton Builders, Inc. v. Okla. Sur. Co.*, 903 F.3d 435, 450 (5th Cir. 2018).

One of those questions of law is the focus of the appeal: whether D2 could recover beyond the contract price for "excavation of unanticipated excess soil."[3] The district court concluded D2 could recover under either a contract or quantum meruit theory.

## A.

Thompson challenges the contract ruling on the ground that D2 bore the risk that the site might be unbalanced and thus cannot recover beyond the contract price for any "excess" excavation work. A party to a Texas

---

[3] Texas courts use the term "extra work" to mean work "which, by definition is work 'arising outside and independent of the contract, something not required in its performance.'" Joe F. Canterbury, Jr. & Robert J. Shapiro, Texas Construction Law Manual § 1:28 (3d ed. 2019) (quoting *Brown-McKee, Inc. v. Western Beef, Inc.*, 538 S.W.2d 840, 844 (Tex. Civ. App.—Amarillo 1976, writ refused n.r.e.). In contrast, "additional work" is "that required in the performance of the contract and without which it could not be carried out." *Id.* § 8:8 (quoting *City of Houston v. L.J. Fuller, Inc.*, 311 S.W.2d 285, 290 (Tex. Civ. App.—Houston 1958, no writ)). We use the different term "excess," as that is how the district court and the parties describe the excavation work for the unanticipated dirt removal. In the Texas parlance, we conclude that this was "additional work" because it was required under the contract.

construction project is liable for breach of contract when it provides inadequate construction plans and the contract allocates to that party the risk of inaccurate plans. *See Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 720–21 (5th Cir. 2005). Thompson asserted the site was balanced, which the district court rightly found was not true.[4]

The remaining question is which party bore the risk that the site might be unbalanced. The default rule in Texas, dating back to a case interpreting an 1899 contract to construct a building in San Antonio, is that the party doing the work bears the risk that it will end up being more difficult than anticipated unless the contract shifts that risk to the buyer of the services. *Lonergan v. San Antonio Loan & Tr. Co.*, 104 S.W. 1061, 1065–66 (Tex. 1907); *see also Interstate Contracting*, 407 F.3d at 720–21 ("In order for an owner to breach a contract by supplying inadequate plans to a contractor, [Texas law] require[s] that the contract evidence an intent to shift the burden of risk of inadequate plans to the owner."). This default rule flows from the basic contract principle that "where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811 (Tex. 2012) (citation omitted). If a factory agrees to manufacture 100 widgets for $500, it cannot later charge $600 if it ends up taking more labor or materials to produce the widgets than expected.

The default rule applies here because the excavation contract does not allocate to Thompson the risk that the site would be unbalanced. If anything, it placed that risk on D2. D2 agreed that it had "visited the Project site, become familiar with local conditions under which the Work is to be

---

[4] D2 did not, however, bring claims for breach of warranty or fraudulent inducement based on misrepresentation.

performed and correlated personal observations with requirements of the Contract Documents." It further represented that it would "evaluate and satisfy itself" about a number of conditions, including "the location, condition, layout, and nature of the Project site and surrounding areas." As a result, D2 would not be "entitled to an adjustment in the Contract Price or an extension of time resulting from [its] failure to fully comply" with those conditions. That agreement to verify the topography of the site put the risk on D2. "Someone has to bear the loss of additional costs," *id.* at 811, and the excavation contract did not shift those costs to Thompson. *Compare Dall./Fort Worth Int'l Airport Bd. v. INET Airport Sys., Inc.*, 819 F.3d 245, 252 (5th Cir. 2016) (contractor did not assume all risks when the contract contained no provision on point and a mixture of provisions allocating risks of defects to both parties), *with Interstate Contracting*, 407 F.3d at 721–23 (contractor assumed risk when the written instrument obligated contractor to independently investigate work site and explicitly allocated "[a]ll risks of differing subsurface conditions" to the contractor).

D2's attempt to distinguish *MasTec* and *Interstate Contracting* because they involved different contractual language fails on two levels. First, there must be language shifting the burden to Thompson. So even if the language we just cited does not assign the risk to D2, the contract must say that Thompson assumed the risk that the project would require removing more dirt than the plans predicted. It does not. Second, the difference in language is only a matter of degree. To be sure, the language in *MasTec* was about as clear an assumption of risk as possible: "[MasTec] assumes full and complete responsibility for any such conditions pertaining to the Work, the site of the Work or its surroundings and all risks in connection therewith." 389 S.W.3d at 806 (alteration in original). The contract in *Interstate Contracting* similarly stated: "All risks of differing subsurface conditions shall be borne solely by the [contractor]." 407 F.3d at 721. But just because stronger language

existed in other cases does not mean that "the parties' intentions as expressed in [this] writing" are different. *MasTec*, 389 S.W.3d at 805. D2 knew it had an obligation to confirm the site's topography because it tried to do so—but gave up—when Thompson resisted further delay. *See Granite Constr. Co. v. Tex. Dep't of Transp.*, 2012 WL 5974085, at *8 (Tex. App.—Austin Nov. 20, 2012, no pet.) (discussing contractual language obligating a party to examine a work site and stating that "[c]ourts interpreting similar contractual provisions have consistently held that this type of language precludes a contractor from maintaining a claim for varying site conditions.").

Although all along its contract claim has relied on the notion that Thompson mispresented that the site was balanced, D2 now tries to distinguish *Interstate Contracting* and *Lonergan* by arguing this is not a "defective plans and specifications case." Metaphysically distinguishing between "defective plans and specifications" on the one hand and a mere representation that a site is balanced on the other is inconsistent with Texas law, as Texas cases largely reason that "plans and specifications . . . constitute an affirmative representation on which a contractor could rely." *Interstate Contracting*, 407 F.3d at 718; *see also id.* at 716–720 (collecting cases).

Of course, a valid modification of the contract via a change order could render Thompson liable. But change orders, like any modification, must satisfy the normal requirements of a contract: "a meeting of the minds supported by consideration." *Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 228 (Tex. 1986); *see also INET*, 819 F.3d at 252 ("[A]ny change order to adjust for the defects discovered by INET required the assent of both parties."). Critically, "[a] promise to fulfill a pre-existing obligation cannot serve as new consideration for an amendment to a contract." *In re OSG Ship Mgmt.*, 514 S.W.3d 331, 338 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

The oral change order lacked that consideration.  D2 acknowledges that the alleged consideration was its exporting excess soil.  The original contract already obligated D2 to do so without any compensation beyond the contract price.  Hauling the dirt, therefore, cannot serve as consideration.  The oral change order is void.

If the contract had required less excavation work than the parties expected, Thompson would not be able to get a refund on the $630,000 it agreed to pay.  Likewise, when the work turned out to involve more work than the parties expected, D2 cannot recover more than the $630,000.  Thompson did not breach its contract with D2 when the site turned out to be unbalanced.   Accordingly, we vacate the $257,588.53 breach-of-contract award for "excavation of unanticipated excess soil."

B.

The district court concluded that quantum meruit was an alternative remedy "[i]n the event that the extra excavation work associated with the excess soil falls outside the scope of the contract."  We have just held that the contract required excavation of all the soil, however much it turned out to be.  So by its own terms, the quantum meruit ruling does not stand because this work was within, not outside, the contract.

The district court properly understood that quantum meruit was available only if the excess soil work was not covered by the contract.  *Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80, 86 (Tex. 1976) (recognizing that contractor could recover quantum meruit "for the reasonable value of services rendered and accepted which *are not covered by the contract*" (emphasis added)), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989).  "Quantum meruit is an equitable theory of recovery which is based on an implied agreement to pay for benefits received."  *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832

S.W.2d 39, 41 (Tex. 1992).  It is generally unavailable if a valid contract covers the goods or services a plaintiff furnished.  *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005).  Quantum meruit corrects an injustice when a promise to pay was implied.  If the parties reached an express agreement allocating payments, services, and risks—that is, a contract—then a court should not step in and impose its view of what would constitute an equitable arrangement.

Texas recognizes an exception to this general rule in the construction context.  A plaintiff that does not substantially perform a construction contract, and thus cannot "recover[] under the express contract," may pursue quantum meruit for the value of its services.  *See Murray v. Crest Constr., Inc.*, 900 S.W.2d 342, 345 (Tex. 1995).  Unlike the goods or services provided under many contracts, partial work done on a construction project cannot be transferred to another buyer.  So it would be unjust to allow the party receiving the partial construction to not pay anything for it.  *See Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990) (noting that "quantum meruit is founded on unjust enrichment").  If there is no free lunch, then certainly there is no free house.  As a result, when a breaching contractor cannot recover the contract price, it nonetheless may be able to recover in quantum meruit.  *Murray*, 900 S.W.2d at 345; *cf.* WARD FARNSWORTH, RESTITUTION: CIVIL LIABILITY FOR UNJUST ENRICHMENT 89–90 (2014) (recognizing that the related equitable claim of restitution may be available when a breaching party no longer has a contract claim but should recover for benefits conferred).

That "partial performance" exception does not fit this case.  D2 seeks a quantum meruit recovery despite having substantially performed its contractual duties and, therefore, being able to collect on the contract.  In other words, D2 wants quantum meruit *plus* the contract price.  That is not allowed.  *See Balfour Beatty Rail, Inc. v. Kan. City S. Ry. Co.*, 173 F. Supp. 3d

363, 451 (N.D. Tex. 2016) (denying quantum meruit when the work was within the scope of the contract); *Bright Excavation, Inc. v. Pogue Constr. Co.*, 2020 WL 1921681, at *7 (Tex. App.—Dallas April 21, 2020, no pet.) (same); *see also* FARNSWORTH, *supra*, at 90 (explaining that the contract price remains "a ceiling" on what a breaching party can recover from the defendant on an equitable claim). It would override the parties' agreement to allow the plaintiff to recover more than the contract price for work the contract required. *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 50 (Tex. 2008) ("[W]hen a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement." (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000))). Because the unanticipated excavation work was D2's responsibility under the contract, quantum meruit is not a vehicle for recovering more than the contract price.

Neither breach of contract nor quantum meruit allows D2 to recover for "excavation of unanticipated excess soil."

### III.

We have emphasized the sanctity of the agreement the parties reached in rejecting any remedy beyond the contract price. Recall, though, that the district court awarded $81,068 to ensure that Thompson paid that full contract price. That figure included the unpaid amounts to D2, reduced by the $20,000 it cost Thompson to complete the work once D2 stopped performing.

Thompson also challenges this award. This argument is part of its appeal of the district court's rejection of its counterclaim for breach of contract. Thompson contends that, because D2 stopped performing before it completed the work, Thompson does not owe the $81,068 in outstanding charges to D2 and instead should have received damages from D2 for the

costs of completing the work.  D2 argues that Thompson did not adequately brief this issue.  Forfeiture presents a close call, which we avoid making because the deference we owe the district court's findings allows us to readily reject the argument on the merits.

The district court found that D2 did not breach the contract, and even if it did, Thompson's prior breach and its failure to manage the construction site excused D2's failure to perform.  The district court found that management of the site was so deficient that D2 had to regrade the same areas as many as six times and was *unable* to complete its work in other parts of the site, justifying D2's cessation of work.  That finding is not clear error.  It is a bedrock principle of contract law that "the conduct of one party to a contract which prevents the other from performing his part is an excuse for non-performance."  *United States v. Peck*, 102 U.S. 64, 65 (1880); *see also Hearne v. Garrett*, 49 Tex. 619, 624–25 (1878) ("Where one is employed to perform some stipulated work . . . and, after part performance of the contract on his part, he is wrongfully prevented from completing the work contracted for, or laboring for the full period of time stipulated, it seems fully settled that the employee may treat the contract as abandoned . . . .").  As a result, we affirm the damage award for $81,068 and the rejection of Thompson's counterclaim.

## IV.

Thompson also challenges the rulings that it violated the Texas prompt pay statute, which results in annual interest of 18% on the unpaid claims, and that D2 could foreclose on statutory and constitutional liens to recover its judgment.  Its only argument is that these remedies require an underlying breach of contract and that it has no contractual liability.  We agreed in part with Thompson's appeal of the contract claims, so it also enjoys only partial success on these claims.  For the contractual recovery we

No. 19-40745

have reversed, obviously there can be no interest or lien.  But for the contractual recovery we affirmed, these other remedies still attach.

\* \* \*

We AFFIRM the judgment for the $81,068 in unpaid work and the related prompt payment statute and lien remedies for that breach of contract. We REVERSE the judgment of $257,588.53 for the "excavation of unanticipated excess soil" and RENDER judgment for Thompson on those breach of contract and quantum meruit claims.  We REMAND for modification of the judgment consistent with this opinion.